UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JIMMIE PHILIP WARREN,

            Plaintiff,

    v.

COMMISSIONER OF SOCIAL
SECURITY,

            Defendant.

Case No. 17-cv-02974-JSC

**ORDER RE: CROSS-MOTIONS FOR
SUMMARY JUDGMENT**

Re: Dkt. Nos. 17, 21

       Plaintiff Jimmie Warren seeks social security benefits for various impairments, including: cervical degenerative disc disease, status post cervical fusion from C5 through C7, degenerative joint disease of the knees, degenerative joint disease of the left great toe, and extreme neck pain. (Administrative Record ("AR") 22.)  Pursuant to 42 U.S.C. § 405(g), Mr. Warren filed this lawsuit for judicial review of the final decision by the Commissioner of Social Security ("Commissioner") denying his benefits claim.  Now before the Court are Plaintiff's and Defendant's Motions for Summary Judgment.[1]  (Dkt. Nos. 17, 21.[2])  Because the Administrative Law Judge ("ALJ") properly weighed the medical opinion evidence, the Court DENIES Plaintiff's motion and GRANTS Defendant's cross-motion.

LEGAL STANDARD

       A claimant is considered "disabled" under the Social Security Act ("SSA") if he meets two requirements.  *See* 42 U.S.C. § 423(d); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). First, the claimant must demonstrate "an inability to engage in any substantial gainful activity by

---

[1] Both parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c).  (Dkt. Nos. 6; 11.)
[2] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Second, the impairment or impairments must be severe enough that he is unable to do her previous work and cannot, based on her age, education, and work experience "engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). To determine whether a claimant is disabled, an ALJ is required to employ a five-step sequential analysis, examining: (1) whether the claimant is "doing substantial gainful activity"; (2) whether the claimant has a "severe medically determinable physical or mental impairment" or combination of impairments that has lasted for more than 12 months; (3) whether the impairment "meets or equals" one of the listings in the regulations; (4) whether, given the claimant's "residual functional capacity," the claimant can still do her "past relevant work"; and (5) whether the claimant "can make an adjustment to other work." *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012); *see* 20 C.F.R. §§ 404.1520(a), 416.920(a).

## PROCEDURAL HISTORY

In February 2014, Mr. Warren filed an application for Supplemental Security Income ("SSI") under Title XVI of the SSA. (AR 168-169.) Mr. Warren alleged disability beginning September 6, 2013. (AR 168.) The application was denied initially and on reconsideration. (AR 103-105, 114-118.) On September 15, 2015, a hearing was held before ALJ Mary Beth O'Connor in San Rafael, California, during which both Mr. Warren and a vocational expert ("VE"), Robert Raschke, testified. (AR 45.) On December 22, 2015, the ALJ issued a written decision denying Mr. Warren's application and finding that Mr. Warren was not disabled under Sections 216(i) and 223(d) of the Social Security Act. (AR 16-33.) Mr. Warren filed a request for review (AR 14-15), which the Appeals Council denied on March 23, 2017. (AR 1-3.) Two months later, Mr. Warren initiated this action, seeking judicial review of the SSA's disability determination under 42 U.S.C. § 405(g). (Dkt. No. 1.) The parties' cross-motions for summary judgment are now pending before the Court. (Dkt. Nos. 17 & 21.)

//

//

Mr. Warren was born on May 6, 1965. (AR 48.) After high school, he received a certification of completion as a machinist from a regional vocational center and he then worked as an aerospace machinist for 15 years. (AR 50.) In September 2013, Mr. Warren went on disability leave because he was experiencing neck pain—the source of his disability. (AR 51.) He did not return to work because his employer said they could not honor his medical restrictions. (*Id.*) Mr. Warren submitted his resignation in 2015. (AR 53.)

## I. Medical Evidence

Plaintiff has seen a variety of physicians as a result of his medical conditions.

### A. Medical History

Mr. Warren was first seen by Dr. Merenbach at Kaiser Permanente Santa Rosa in July 2006. (AR 689.) He thereafter saw Dr. Merenbach and several other Kaiser physicians on a regular basis for cervical degenerative disc disease, status post cervical fusion, degenerative joint disease of the left great toe, and mental health issues. This Order summarizes the medical evidence as of the date of claimed disability.

#### 1) 2013 Medical History

In late February 2013, Mr. Warren reported having a back spasm and Dr. Merenbach ordered an x-ray. (AR 334.) His neck x-ray revealed some disc degeneration and some muscle spasm. (AR 325, 334.) Dr. Merenbach prescribed one capsule of Gabapentin to be taken at bedtime, which could be increased to a maximum of three capsules every bedtime.[3] (AR 330.)

The following month, Mr. Warren saw physical medicine and rehabilitation specialist Dr. Hansen for neck and arm pain. (AR 339.) Dr. Hansen prescribed Prednisone for the pain.[4] (AR 340.) Dr. Merenbach also ordered another x-ray for Mr. Warren's back pain. (AR 343.) The x-

___

[3] Gabapentin, an anticonvulsant, is prescribed to treat symptoms of nerve pain. Gabapentin, medicinenet.com, https://www.medicinenet.com/gabapentin/article.htm#is_gabapentin_available_as_a_generic_drug (last visited July 13, 2018).
[4] Prednisone, a corticosteroid, is used to suppress the immune system and inflammation. Prednisone, medicinenet.com, https://www.medicinenet.com/prednisone/article.htm#what_is_prednisone_and_how_does_it_work (last visited July 20, 2018).

United States District Court
Northern District of California

ray revealed degenerative changes in the disc joints. (AR 351.) There was also mild scoliosis and degenerative disc disease in the lower cervical spine. (*Id.*) Dr. Merenbach advised Mr. Warren to try physical therapy for the wear-and-tear changes of the discs. (AR 358.) Mr. Warren returned to Dr. Hansen later in March for trigger point injections of Lidocaine due to severe back pain.[5] (AR 370.)

In April 2013, Mr. Warren emailed Dr. Hansen concerned that the oral cortisone was not working for the pain in his arm. (AR 374.) Dr. Hansen scheduled Mr. Warren to see Dr. Hari Lakshmanan, M.D., for a cervical epidural steroid injection procedure. (AR 396.) Dr. Lakshmanan thereafter gave Mr. Warren a Kenalog injection to alleviate his pain.[6] (AR 394-95.) Later that month, Mr. Warren emailed Dr. Hansen because he went home from work due to the pain. (AR 415.) He requested more information for surgical intervention or a different nerve pain medication. (AR 416.)

The following month, Mr. Warren reported that he stopped taking his Gabapentin prescription for unspecified reasons and that he had been to work and things were less stressful there. (AR 421.) Mr. Warren informed Dr. Hansen that his nerve pain was not getting any better for which Dr. Hansen re-prescribed 100 mg of Gabapentin to be taken nightly for pain relief. (AR 422.)

In June 2013, Mr. Warren returned to Dr. Merenbach for help with his cervical spinal stenosis and complaints of arm and neck pain. (AR 424.) The visit notes state that Mr. Warren experienced pain, even with Gabapentin, and was considering surgery. (*Id.*) Dr. Merenbach prescribed ibuprofen, ordered x-rays, and an MRI. (AR 425.) The MRI indicated mild degenerative changes in T3-T6. (AR 432.) Dr. Merenbach prescribed Flexeril to Mr. Warren to combat the pain caused by tight muscles.[7] (AR 430.)

---

[5] Lidocaine is a local anesthetic meant to reduce sensation or pain. Lidocaine, medicinenet.com, https://www.medicinenet.com/lidocaine-injection_local/article.htm (last visited July 20, 2018).
[6] Kenalog is used to treat different types of inflammatory conditions, including of the joints. Kenalog, drugs.com, https://www.drugs.com/mtm/kenalog-40-injection.html (last visited July 20, 2018).
[7] Flexeril is used with rest and physical therapy for short-term relief of muscle spasms. Flexeril, medicinenet.com, https://www.medicinenet.com/cyclobenzaprine/article.htm#what_are_the_side_effects_of_cyclobe

The following month, Mr. Warren reported pain in his right shoulder and arm that was exacerbated by stress and concerns at work. (AR 436.) Dr. Merenbach provided Mr. Warren with a medical note to excuse him from work from June 28-July 1, 2013. (AR 437.) She assessed Mr. Warren's neck and indicated full flexion, extension to 20 degrees, right rotation 60 degrees, and left rotation 80 degrees. (AR 437.)

A little over a month later, Mr. Warren called out of work due to arm and neck pain. (AR 444). Dr. Hansen wrote a medical note to excuse Mr. Warren from work for three days, beginning on August 19. (*Id.*) At the end of the month, Mr. Warren had a consultation with Dr. Duong and decided to move forward with surgery. (AR 455.) Mr. Warren was told the wait time for surgery would be 2-3 months and he would be notified if there was an opening sooner. (AR 450-52.) On the same day, Mr. Warren emailed Dr. Hansen to request another medical note for either restricted duty or to be off work due to the pain in his arm until he was able to undergo his surgery, although the surgery was not yet scheduled. (AR 455.) Dr. Hansen wrote a medical note for Mr. Warren to work four hours and receive disability for the other half day of work. (AR 450, 457.) Mr. Warren's employer was unable to accommodate this request. (AR 462.) Around this same time, Dr. Deen noted that Mr. Warren's sleeping condition had worsened due to back pain, that he was stressed, and rated his Global Assessment Function Scale ("GAF") score at 61-71.[8] (AR 622.)

In late October 2013, Mr. Warren emailed Dr. Hansen to complain about increased pain and to request additional medication (Vicodin). (AR 476-77.) Dr. Hansen refused to prescribe narcotic pain medication for the neck pain due to Mr. Warren's marijuana usage. (AR 476.)

---

nzaprine (last visited July 20, 2018).
[8] A Global Assessment of Functioning Scale score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment." *Brewes v. Comm'r of Soc. Sec.*, 682 F.3d 1157, 1165 n.1 (9th Cir. 2012). The score ranges from zero to 100, and serves as a subjective determination that represents the clinician's judgment of the individual's overall level of functioning. *See Sigmon v. Kernan*, No. 06-5807-AHM(JWJ), 2009 WL 1514700, at *9 n.3 (C.D. Cal. May 27, 2009). A GAF score between 61-70 shows "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social or occupational functioning (e.g., theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." Understanding the Global Assessment of Functioning Scale, Seniorhomes.com, https://www.seniorhomes.com/p/understanding-the-global-assessment-of-functioning-scale/ (last visited July 13, 2018).

Instead, Dr. Hansen advised Mr. Warren to increase his Gabapentin dosage. (*Id*.) A few days later, Mr. Warren underwent an anterior spinal fusion involving C5-7. (AR 735.) Post-surgery, Dr. Hansen provided Mr. Warren with a medical note that restricted him from working for two months and put him back to work with restrictions for the following month or two. (AR 491.)

After Mr. Warren's surgery, he returned to Dr. Merenbach on November 4, 2013. (AR 481.) Mr. Warren requested, and was prescribed, additional pain medication. (*Id*.) Dr. Merenbach restricted Mr. Warren from working until late November due to his surgery. (AR 491.)

Mr. Warren saw Dr. Deen in December 2013. (AR 632.) Dr. Deen's assessment noted that Mr. Warren was stressed, his back pain was affecting his sleep, and his mood was affected by his job status and a friend's death. (AR 632-33.) He reported drinking about two drinks per night and smoking 1-2 puffs of marijuana daily. (*Id*.) Also in December, Mr. Warren told Dr. Hansen that he would like to return to work on January 8, 2014, but requested a medical note with further temporary work restrictions and with permanent restrictions for his neck issues. (AR 499-500.)

**2) 2014 Medical Records**

In early January 2014, Mr. Warren informed Dr. Hansen that his employer could not accommodate his medical restrictions. (AR 502.) Mr. Warren asked Dr. Hansen about the process for applying for Social Security Disability Insurance. (*Id*.)

In February 2014, Mr. Warren returned to Dr. Merenbach due to knee and neck pain. (AR 516.) Dr. Merenbach examined and administered pain relief injections in both knees. (*Id*.) Mr. Warren's neck symptoms had also recurred. (AL 517.) Dr. Merenbach recommended he contact Dr. Hansen regarding these recurrent symptoms. (AR 518.) Later that month, Mr. Warren saw Dr. Hansen and reported that he had been doing well, but then his upper arm pain had increased and he had tightness in his upper back and shoulders. (AR 528.) Dr. Hansen recorded that Mr. Warren was having a lot of stress and it was unclear to her if there was any significantly new problem. (*Id*.) In addition to Mr. Warren's nightly Gabapentin dosage, Dr. Hansen advised him to take Gabapentin during the day for his pain. (*Id*.)

6

Dr. Deen's February assessment noted that Mr. Warren was no longer working because his employer could not make accommodations. (AR 532.) Dr. Deen recorded that Mr. Warren was more irritable because of his mother's nagging, having sleep difficulties, and smoking 1-2 puffs of marijuana daily. (*Id*.) He also noted that Mr. Warren's back pain was affecting his movement. (*Id*.)

In April 2014, Mr. Warren reported to Dr. Deen that his mood, sleep, and thinking had improved. (AR. 657.) He had stopped drinking but continued smoking 1-2 puffs of marijuana daily. (*Id*.) Mr. Warren's GAF was 71-81. (AR 659.) Mr. Warren also reported that he was on extended disability because his employer could not make the accommodations he needed. (AR 660.) The following month, Mr. Warren phoned Dr. Deen complaining of anxiety and depression. (AR 665.) Mr. Warren reported that he was not taking his Ativan.[9] (*Id*.) He reported to being fearful that people were treating him differently, that he was off from work, bored, and feeling at a loss. (AR 667.) Mr. Warren's marijuana consumption had increased, but he agreed to cut back or stop. (*Id*.) In a follow-up the following month, Mr. Warren reported that his paranoia was much better since the Gabapentin dose was reduced, although he was not taking his Ativan. (AR 669.) He also reported to cutting back on smoking marijuana. (*Id*.) Dr. Deen noted that his mood, thinking, and sleep were much better. (*Id*.) Mr. Warren's GAF was 71-81. (AR 671.)

In June 2014, Mr. Warren returned to Dr. Merenbach and alleged that he was experiencing back pain and toe problems. (AR 742.) Dr. Merenbach scheduled Mr. Warren for back class and advised him to stop smoking tobacco. (AR 744.) An x-ray found severe degenerative joint disease at the left great toe. (AR 747.)

**3) 2015 Medical Records**

In April 2015, Mr. Warren contacted Dr. Hansen and requested ceasing using Gabapentin. (AR 882.) Dr. Hansen informed Mr. Warren that he could taper off his medicine if he was not experiencing symptoms of pain. (*Id*.) Two months later, Mr. Warren reported that he could not continue taking Gabapentin because it made him more moody. (AR 923.) Dr. Hansen wrote that

---

[9] Ativan is used to treat anxiety. Ativan, medicinenet.com,
https://www.medicinenet.com/lorazepam/article.htm (last visited July 20, 2018).

Mr. Warren looked better overall than when she first saw him in terms of mood and overall health although Mr. Warren's neck was stiff. (AR 924.) Mr. Warren reported that he had discontinued using marijuana. (AR 923.) Mr. Warren also reported that his left arm had been hurting and his right arm was hurting. (*Id*.) Dr. Hansen recorded that Mr. Warren was doing well as long as he continued Gabapentin and did not work too much. (*Id*.)

In June 2015, Mr. Warren was referred to Dr. Hofmann because Dr. Deen transferred to a different clinic. (AR 703.) He told Dr. Hofmann that he had stopped smoking marijuana because it was making him paranoid. (*Id*.) His Seroquel dosage was increased because he reported having trouble staying asleep. (*Id*.) Mr. Warren also reported experiencing anxiety; he had trouble controlling his worrying and being nervous. (*Id*.) Dr. Hofmann indicated Mr. Warren's GAF score was at 51-60. (AR 707.) Mr. Warren reported that neck surgery worsened his symptoms of depression and paranoia. (AR 708.)

Two months later, Dr. Merenbach provided Mr. Warren with the results of his MRI. (AR 936.) There were signs of wear-and-tear that could cause pain and a protruding disc that did not put pressure on the spinal cord. (*Id*.) Dr. Merenbach advised Mr. Warren to continue taking Gabapentin and to consult with Dr. Hansen "about what else can be done." (*Id*.)

## B. Medical Evaluations

In addition to routine medical visits, Mr. Warren underwent several examinations to determine his functional capacity in support of his application for disability benefits. Below is a summary of these evaluations.

### 1. Treating Physician Ellen Grossman Merenbach, M.D.

Dr. Merenbach, Mr. Warren's primary care physician, has been seeing him every several months since July 2006. (AR 689.) Dr. Merenbach assessed Mr. Warren and completed his Cervical Spine Residual Functional Capacity Questionnaire on September 11, 2014. (AR 689.) She diagnosed him with cervical radiculopathy. (*Id*.) She concluded that Mr. Warren had chronic pain in his neck that radiates down to the right arm and both shoulders were tight. (*Id*.) She stated that Mr. Warren had a significant limitation of motion and that Mr. Warren was incapable of even "low stress" jobs because any job would involve pressure on his cervical spine. (AR 691.) Mr.

8

Warren could sit for one hour at a time and walk 1-2 hours at a time, but he would need to have a 10-minute walk approximately every hour. (AR 691-92.) He could sit for about four hours and stand/walk for about four hours in an eight-hour workday. (*Id*.) Dr. Merenbach precluded Mr. Warren from lifting 50 pounds, from looking down, looking up, limited him to rarely turning his head right or left, and occasionally holding his head in a static position. (*Id*.) He was restricted from climbing ladders but could occasionally twist, stoop, bend, crouch, squat, and climb stairs. (AR 693.) Mr. Warren had significant limitations with reaching, handling, or fingering. (*Id*.) Dr. Merenbach opined that he must take unscheduled breaks during an 8-hour workday and would likely be absent from work three or more days per month. (*Id*.) She stated that Mr. Warren had significant limitations for cervical range of motion. (AR 689.) Mr. Warren could extend 20 degrees, flex 30 degrees, rotate 75 degrees left, rotate 45 degrees right, left lateral bend 45 degrees, and right lateral bend 45 degrees. (*Id*.)

### 2. Treating Physician Mette Hansen, M.D.

Dr. Hansen imposed permanent restrictions on Mr. Warren. (AR 939.) Dr. Hansen wrote that Mr. Warren could lift up to 20 pounds, but not repetitively. (*Id*.) She restricted Mr. Warren from any prolonged forward bending, repetitive bending, and repetitive head movements. (*Id*.) She also indicated that his sitting/standing activities should be limited as needed, including alternating positions every 30-45 minutes. (*Id*.)

### 3. Treating Physician Huy Duong, M.D.

In January 2014, Mr. Warren's postoperative cervical x-ray revealed good positioning, normal alignment, and solid fusion. (AR 503.) There was stability on flexion and extension. (*Id*.) His February 2014 x-ray revealed that his status post-surgery remained unchanged and in good position. (AR 532.) His alignment was also normal. (*Id*.) At Mr. Warren's six-month exam, Dr. Duong noted that Mr. Warren's right upper extremity pain was resolved and his neck pain had improved. (AR 735.)

### 4. Non-Examining Physician Nalini Tella, M.D.

Dr. Nalini Tella, a non-examining state agency physician, reviewed the documentary evidence and completed a Physical Residual Functional Capacity ("RFC") Assessment on April

9

30, 2014.  (AR 79-87.)  Dr. Tella diagnosed Mr. Warren with severe discogenic and degenerative

disorders, severe major joint dysfunction, non-severe schizophrenia and other psychotic disorders,

and non-severe anxiety disorder.  (AR 81.)  Dr. Tella concluded that Mr. Warren could lift or carry

up to 10 pounds frequently and up to 20 pounds occasionally; could stand or walk up to six hours

in an eight-hour work day; could sit up to six hours in an eight-hour work day; and had no

limitations on pushing or pulling other than as noted for lifting and/or carrying.  (AR 83.)  Dr.

Tella further indicated that Mr. Warren had postural limitations, but that he could climb ramps,

stairs, and ladders occasionally, and could stoop, kneel, and bend frequently.  (AR 84.)  Dr. Tella

concluded that Mr. Warren also had manipulative limitations with limited left and right overheard

reaching but no limitations for handling, fingering, or feeling.  (*Id*.)  Mr. Warren also had no

visual, communication, or environmental limitations.  (*Id*.)

### 5. Non-Examining Physician S. Hanna, M.D.

On reconsideration of Mr. Warren's claim, Dr. S. Hanna conducted a case analysis on July

3, 2014.  (AR 95-101.)  Dr. Hanna adopted Dr. Tella's initial RFC assessment with no additional

changes.  (AR 97-98.)

### C.  Other Evidence

In addition to live testimony, Mr. Warren completed a Function Report and Kirsten

Sullivan, Mr. Warren's mother, completed a Third Party Function Report.  (AR 199-217.)

### 1. Plaintiff's Function Report

Mr. Warren completed his Function Report on February 22, 2014.  (AR 199-206.)  Prior to

his neck surgery, Mr. Warren was able to do heavy yard work, lift things, stand for long periods of

time, host dinner parties, and sleep.  (AR 200.)  After surgery, he reported that he could prepare

simple meals, wash dishes, do the laundry, perform light gardening, very light housekeeping, go

grocery shopping, drive to the doctor's office, go out alone, manage finances, watch television,

and travel to Denmark annually.  (AR 201-03.)  Mr. Warren complained about experiencing pain

while walking; he said he was only able to walk for 15 minutes before needing a five-minute rest.

(AR 204.)  He noted that he had insomnia and his ability to perform daily tasks had declined due

to his pain and the limitations imposed by his doctor.  (AR 201-02.)

## 2. Ms. Sullivan's Third Party Function Report

Ms. Sullivan's Third Party Function Report was completed a few days later. (AR 210-17.) She noted that she lives in the in-law unit on the same property as Mr. Warren. (AR 210.) Mr. Warren complains about pain, he is tired easily, she sees his light on in the middle of the night, he no longer gardens, he needs help with cleaning, and he no longer socializes or hosts dinner parties. (AR 210-15.) However, he can cook for himself, grocery shop, watch television, visit his sister in Denmark annually, and feeds his cat. (*Id.*)

## II.     The ALJ Hearing

On September 15, 2015, Mr. Warren appeared with counsel at his scheduled hearing before ALJ Mary Beth O'Connor in San Rafael, California. (AR 46.) Mr. Warren and VE Robert Raschke both testified at the hearing. (*Id.*)

### A.  Plaintiff's Testimony

Mr. Warren has had back pain since 2011 and underwent neck surgery on October 28, 2013. (AR 56, 195.) Post-surgery, Mr. Warren has experienced limited neck flexion; including restrictions in looking up and down, left and right. (AR 56.) He also has arthritic knees and anxiety; although these conditions do not prevent him from working, his neck pain limits his ability to carry out a normal workday. (AR 56, 59.) For example, he cannot regularly lift, maneuver, or carry things greater than 30 to 40 pounds. (*Id.*) He regularly goes for two half-hour walks daily. (AR 57.) Mr. Warren is unable to sit comfortably for more than an hour because his neck starts to get stiff and sore. (*Id.*) He alternates between sitting and standing to alleviate the pain. (AR 58.) Mr. Warren indicated that the pain starts to spread to his arms, usually by the end of the day when he is tired. (*Id.*) Mr. Warren stated that he does not sleep well; he uses two pillows to support his neck, and wakes up at least once at night. (AR 62.)

To address his various symptoms, Mr. Warren takes Abilify, Vitamin D, Vitamin B12, and Calcium Carbonate with D3. (AR 59.) At night, he takes Gabapentin for nerve pain and Seroquel as a sleep aid, although he takes a low dosage because it makes him moody and irritable. (*Id.*) He also takes ibuprofen three times a day for pain. (AR 195.)

**B. Vocational Expert's Testimony**

The ALJ presented the VE with a hypothetical individual of Mr. Warren's age, education, and work background who could perform light work as defined in 20 C.F.R. § 404.1567(b). (AR 67.) The VE testified that certain jobs existed in the region and nationally that such a hypothetical person could perform, including an assembler, DOT code 739.687-030, classified at a light production, of which there are 3,000 jobs in California and 332,000 plus jobs nationally; a collator, code 653-687.010, 2 and a light job, where there are 1,550 jobs California and 134,000 jobs nationally; or a packing worker, DOT code 753.687-038, classified at an SVP of 2, of which there are 4,800 jobs in the region and 332,000 jobs nationally. (AR 68-69.)

The ALJ then offered a hypothetical of an individual with the same light work limitations, adding additional limitations that the individual could only sit in one-hour increments with a 10-minute break from sitting with the ability to continue working, occasionally stooping, kneeling, and crouching, occasionally moving his neck up and down, and occasionally moving the neck side to side. (AR 69-70.) The VE stated that these additional limitations would preclude all the jobs he previously stated because they require a degree of neck flexion beyond the occasional. (*Id.*) The ALJ asked if there was work available for someone who could frequently move his or her neck both up and down and side to side. (AR 71.) The VE stated that the previously mentioned jobs would still be doable but would be problematic for an individual who had neck injuries and limited neck flexion. (*Id.*) Based on the VE's own experience, the production area is often closed off to those with neck injuries and he would have to do a complete review on the testimony because there is no limitation for neck flexion in the DOT and SCO data. (AR 71-72.) The ALJ had no further questions. (AR 73.)

### III. The ALJ's Findings

In a December 22, 2015 written decision, the ALJ found Mr. Warren not disabled under sections 216(i), 223(d) and 1614(a)(3)(A) of the Social Security Act, taking into consideration the testimony and evidence, and using the SSA's five-step sequential evaluation process for determining disability. (AR 16-20); *see* 20 C.F.R. §§ 404.1520(a), 416.920(a).

1    At step one, the ALJ found that Mr. Warren had not engaged in substantial gainful activity

2    since his alleged onset date of September 6, 2013.  (AR 21.)

3    At step two, the ALJ determined that Mr. Warren had the following severe impairments:

4    (1) cervical degenerative disc disease; (2) status post cervical fusion, degenerative joint disease of

5    the knees; and (3) degenerative joint disease of the left great toe.  (AR 22.)

6    At step three, the ALJ found that Mr. Warren did not have an impairment or combination

7    of impairments that meets or medically equals the severity of one of the listed impairments in 20

8    C.F.R. Part 404, Subpart P, Appendix 1.  (AR 27.)  Specifically, the ALJ considered the criteria of

9    listings 1.04 and 1.02.  (*Id*.)  With regard to 1.04, the ALJ concluded the severity of Mr. Warren's

10   spinal impairment did not meet or equal the requirements because he did not have the significant

11   limitation of motion, neurological deficits, or inability to ambulate effectively as described in that

12   section.  (*Id*.)  With regard to 1.02, the ALJ concluded that the severity of Mr. Warren's bilateral

13   knee impairment and left great toe impairment did not meet the requirements because he could

14   ambulate effectively, he did not have gross anatomical deformity based upon the physical

15   examination, and his care had been conservative.  (*Id*.)

16   The ALJ found that Mr. Warren did not have a severe mental disorder that would meet or

17   equal listings 12.03, 12.04, and 12.06.  (*Id*.)  The ALJ concluded that Mr. Warren only had mild

18   functional limitations.  (*Id*.)

19   The ALJ found that Plaintiff retained the RFC to perform light work as defined in 20

20   C.F.R. § 404.1567(b) except he cannot sit longer than an hour continuously, after which he must

21   change position for ten minutes before he can sit again.  (AR 28.)  He is limited to occasional

22   climbing of ramps, stairs, ladders, ropes, or scaffolds.  (*Id*.)  He is limited to frequent balancing.

23   (*Id*.)  He is restricted to occasional stooping, kneeling, crouching, and crawling.  (*Id*.)  He is

24   limited to frequent movement of the neck up and down or side to side.  (*Id*.)  He is restricted to

25   frequent bilateral overhead reaching.  (*Id*.)

26   To reach this conclusion, the ALJ gave great weight to the non-examining state agency

27   physicians, Dr. Tella and Dr. Hanna, because their assessments were credible and consistent with

28   the medical evidence.  (AR 30.)  Dr. Tella diagnosed cervical disc disease and major joint

13

dysfunction.  (AR 26.)  She did not diagnose any severe mental disorder.  Dr. Hanna concurred with Dr. Tella's medical opinion.  (*Id*.)

The ALJ accorded Dr. Deen's medical opinion probative weight because he was Mr. Warren's long-time treating physician.  (AR 28.)  Dr. Deen assessed only mild functional limitations, which were consistent with the findings of the state agency physicians.  (*Id*.)  The ALJ accorded Dr. Hofmann's opinion less weight because her limitations were inconsistent with the examinations by Dr. Deen.  (AR 28, 30.)

The ALJ accorded Dr. Hansen's medical opinion partial weight to the extent it was consistent with the ALJ's conclusions.  (AR 29-30.)  The limitations she imposed on Mr. Warren were credible and consistent with the conclusion that he could perform light work.  (AR 29.)

The ALJ gave little weight to the opinion of treating physical, Dr. Merenbach, because she imposed many functional limitations that were not warranted by the objective medical evidence.  (AR 30.)  The ALJ found that the limitations were too restrictive and were only partially credible to the extent that they did not conflict with the findings by the ALJ.  (*Id*.)  The ALJ faulted Dr. Merenbach for not including any significant narrative discussion of the medical findings on which she based her conclusions.  (*Id*.)

Finally, regarding Mr. Warren's own reports of his disabilities, the ALJ found his statements partially credible due to a good work history but not credible to the extent that Mr. Warren alleged an inability to perform any work activity because it was not supported by the objective medical evidence.  (AR 28.)  The ALJ noted that Mr. Warren has not pursued extensive treatment for neck pain postoperatively and his care has been conservative.  (AR 29.)  Mr. Warren's credibility was undermined by the multiple reports of medical non-compliance, such as not using compression stockings and his reports of extensive activities including going for walks, performing light gardening, and preparing his meals.  (AR 30-31.)

At step four, the ALJ found that Mr. Warren was unable to perform any past relevant work based on the VE's testimony that the RFC exceeds the requirements of a numerically controlled machine operator.  (AR 67-68.)

1    At step five, the ALJ concluded that Mr. Warren could perform jobs that exist in

2    significant numbers in the state and national economy based on the VE's testimony. (AR 69.)

3    The VE found that Mr. Warren could perform light work, including as a packing worker or a

4    collator. (*Id*.) Therefore, the ALJ found that Mr. Warren was not disabled. (*Id*.)

5    **IV.    Appeals Council**

6        Mr. Warren filed a request for review challenging the ALJ's rejection of: (1) Dr.

7    Merenbach's opinion; and (2) Mr. Warren's pain and symptom testimony. (AR 14-15.) The

8    Appeals Council denied the request for review on March 23, 2017 and this civil action followed.

9    (AR 1-3; Dkt. No. 1.)

10                            **DISCUSSION**

11       Mr. Warren challenges the same two aspects of the ALJ's decision that he challenged

12   before the Appeals Counsel. Namely, that the ALJ erred as a matter of law by (1) improperly

13   weighing the medical opinion evidence; and (2) rejecting Mr. Warren's pain and symptom

14   testimony.

15   **I.    The ALJ's Consideration of Medical Opinion Evidence**

16       **A.    Legal Standard**

17       In the Ninth Circuit, courts must "distinguish among the opinions of three types of

18   physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do

19   not treat the claimant (examining physicians); and (3) those who neither examine nor treat the

20   claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995) (as

21   amended (Apr. 9, 1996)). "A treating physician's opinion is entitled to more weight than that of

22   an examining physician, and an examining physician's opinion is entitled to more weight than that

23   of a nonexamining physician." *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007). If a treating

24   doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and

25   convincing" reasons. *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991). And "even if the

26   treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this

27   opinion without providing 'specific and legitimate reasons' supported by substantial evidence in

28   the record for so doing." *Lester*, 81 F.3d at 830 (internal citations omitted). Likewise, "the

                                      15

opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." *Id.* at 830–31.

"The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting medical evidence, stating his interpretation thereof, and making findings." *Cotton v. Bowen*, 799 F.2d 1403, 1407 (9th Cir. 1986). "The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." *Lester*, 81 F.3d at 831 (internal citation omitted). Ultimately, "the ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Embrey v. Bowen*, 849 F.2d 418, 421–22 (9th Cir. 1988).

"When an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs. In other words, an ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Garrison v. Colvin*, 759 F.3d 995, 1012–13 (9th Cir. 2014) (internal citation omitted). In conducting its review, the ALJ "must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence.'" *Hill v. Astrue*, 388 F.3d 1144, 1159 (9th Cir. 2012) (internal citations omitted). "An ALJ may not cherry-pick and rely on portions of the medical record which bolster his findings." *See, e.g.*, *Holohan v. Massanari*, 246 F.3d 1195, 1207–08 (9th Cir. 2001) (holding that an ALJ may not selectively rely on some entries and ignore others "that indicate continued, severe impairment"). "Particularly in a case where the medical opinions of the physicians differ so markedly from the ALJ's[,]" "it is incumbent on the ALJ to provide detailed, reasoned, and legitimate rationales for disregarding the physicians' findings." *Embrey*, 849 F.2d at 422.

//

//

### B. Analysis

To reject the opinion of Mr. Warren's treating physician, Dr. Merenbach, in favor of the opinion of the non-examining consultants, Drs. Tella and Hanna, the ALJ was required to provide specific and legitimate reasons supported by substantial evidence. *See Lester*, 81 F. 3d at 830-31.

#### 1. Treating Physician Dr. Merenbach

Mr. Warren contends that the ALJ erred by discounting treating physician Dr. Merenbach's opinion. The ALJ gave Dr. Merenbach's opinion partial weight because: (1) her limitations were inconsistent with the objective medical evidence; (2) her opinion regarding Mr. Warren's functional limitations was provided on a five-page form without significant narrative discussion; and (3) her own 2015 letter was inconsistent with her 2014 form. (AR 30.)

The second and third bases for the ALJ's opinion are not specific and legitimate reasons supported by substantial evidence for rejecting Dr. Merenbach's opinion. The ALJ cannot just reject a treating physician's opinion because it was expressed on a check-box form. Check-box forms that are based on significant experience with the claimant and supported by numerous records are "entitled to weight that an otherwise unsupported and unexplained check-box form would not merit." *Garrison v. Colvin*, 759 F.3d 995, 1013 (9th Cir. 2014). Dr. Merenbach had been treating Mr. Warren for years prior to completing his disability form. (AR 689-693.) The ALJ thus erred in disregarding the check-box form outright without considering that it was supported by Dr. Merenbach's treatment records and experience with Mr. Warren.

The ALJ also erred in concluding that Dr. Merenbach's opinion was inconsistent because, in a letter attaching Mr. Warren's July 2015 MRI results, Dr. Merenbach did not identify any functional limitations. This ignores that the documents were provided for two different purposes. The purpose of Dr. Merenbach's letter titled "Your test results" was to provide Mr. Warren with the results of his MRI, not to assess his functional limitations. (AR 936.) The letter reads: "Your MRI shows wear-and-tear changes that cause pain and a protruding disc that does not put pressure on the spinal cord." (*Id.*) This letter is not inconsistent with Dr. Merenbach's opinion.

However, substantial evidence does support the ALJ's conclusion that Dr. Merenbach's opinion was not supported by the objective medical evidence. Mr. Warren's other treating

physician, Dr. Hansen (the treating physician on Mr. Warren's neck pain), concluded—as Dr. Merenbach did—that Mr. Warren could not lift more than 20 pounds, he could not have repetitive head movements, that his forward flexion of his neck was limited, and he had limitations on his standing/sitting abilities. (AR 689-693, 939.) Dr. Merenbach, however, also opined that Mr. Warren could not work as a result of these limitations because "any job would involve pressure on [the cervical] spine." Dr. Merenbach does not explain the basis for this extreme conclusion and it is inconsistent with the objective medical evidence that showed good postoperative improvement and recovery. (AR 30, 691.) *See Morgan v. Comm'r*, 169 F.3d 595, 603 (9th Cir. 1991) (internal inconsistencies within a doctor's report constitutes a legitimate basis for rejecting report). Dr. Merenbach's opinion is also inconsistent with the opinions of Mr. Warren's other treating physician, orthopedic surgeon Dr. Duong, who did not impose strict restrictions on Mr. Warren and instead concluded that Mr. Warren had only mild functional limitations. (AR 24-25, 29-30.) Finally, the ALJ reasonably gave more weight to the opinions of Drs. Tella and Hanna, whose conclusions were consistent with the other independent evidence in the record, including the opinions of treating physicians Dr. Hansen and Dr. Duong, and the objective medical evidence. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (finding that contrary opinion of a non-examining medical expert may constitute substantial evidence when it is consistent with other independent evidence in the record). These opinions provide a specific and legitimate basis for rejecting Dr. Merenbach's opinion regarding Mr. Warren's ability to work.

Mr. Warren's insistence that that the ALJ improperly rejected Dr. Merenbach's opinion as imposing functional limitations not supported by the objective medical evidence without identifying the objective medical evidence is unavailing. The ALJ concluded that Mr. Warren's treating and consulting physicians imposed mild functional limitations and recommended limitations only for the months following the surgery. (AR 29, 492.) Dr. Hansen limited Mr. Warren's range of motion to lifting 20 pounds, alternating between sitting and standing, and no repetitive lifting, or repetitive head movements. (*Id.*) Additionally, Dr. Duong discharged Mr. Warren from his care because his postoperative results indicated he recovered well from surgery. (AR 532, 735.) The ALJ concluded that these results contradicted Dr. Merenbach's opinion that

18

Mr. Warren could only perform a very restricted range of light work. (AR 689-693.) The ALJ supported her conclusion that Dr. Merenbach's functional limits were too restrictive with the conclusions of Dr. Hansen, Dr. Duong, and both non-examining state agency physicians. (AR 29-30.) *See Molina,* 674 F.3d at 1113. Although the ALJ did not specifically identify the evidence which contradicted Dr. Merenbach's findings in the same paragraph in which she afforded Dr. Merenbach's opinion some weight, elsewhere in her opinion the ALJ discussed the medical evidence at length, including that which contradicted Dr. Merenbach's finding. (AR 25-27.) Mr. Warren had been walking vigorously, his strength was intact and his gait was normal, with limited neck mobility. (AR 24, 528.) The Court is permitted to "draw[ ] specific and legitimate inferences from the ALJ's opinion." *Magallanes v. Bowen*, 881 F.2d 747, 755 (9th Cir. 1989).

Thus, the ALJ provided specific and legitimate reasons supported by substantial evidence in the record, for according only some weight to Dr. Merenbach's opinion. While neither Dr. Merenbach's use of the check-box form nor her 2015 letter enclosing the MRI results provided substantial evidence for rejecting Dr. Merenbach's opinion, the ALJ's error in this regard is harmless because the fact that Dr. Merenbach's opinion was not supported by the weight of other objective medical evidence is a specific and legitimate reason supported by substantial evidence for rejecting her opinion. *See Burch v. Banhart*, 400 F.3d 676, 679 (9th Cir. 2005) ("A decision of the ALJ will not be reversed for errors that are harmless.").

## II.    The ALJ's Credibility Determination

### A.  Standard for Assessing Credibility

To "determine whether a claimant's testimony regarding subjective pain or symptoms is credible," an ALJ must use a "two-step analysis." *Garrison*, 759 F.3d at 1014. "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal citations and quotation marks omitted). "Second, if the claimant meets the first test, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Id.* (internal citations and quotation marks

omitted).  The clear and convincing standard is "the most demanding required in Social Security cases."  *Moore v. Comm'r of the Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002).  "General findings are an insufficient basis to support an adverse credibility determination."  *Holohan*, 246 F.3d at 1208.  Rather, the ALJ "must state which pain testimony is not credible and what evidence suggests the claimant[ ][is] not credible."  *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993); *see also Ghanim v.Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) ("General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints.") (citation omitted).

## B. Analysis

Applying a two-step analysis, the ALJ concluded Mr. Warren's impairments could reasonably be expected to cause the alleged symptoms; however, his statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely credible.  (AR 31.)  The ALJ gave two reasons for her conclusion: (1) Mr. Warren's medical non-compliance damaged his credibility, and (2) Mr. Warren and his mother reported extensive activities.  (AR 30.)

With regards to Mr. Warren's medical noncompliance, the ALJ identified Mr. Warren's failure to use compression stockings, continued smoking cigarettes against the advice of his physicians, and previously used marijuana against medical advice.  (AR 29-30.)  The ALJ, however, fails to acknowledge that Mr. Warren regularly followed instructions with respect to care for his neck, which was his primary reason for seeking disability.  Both Mr. Warren's failure to wear his compression stockings and his marijuana usage are immaterial to his subjective pain testimony, and instead go to his character generally.  *Ghanim*, 763 F.3d 1154 at 1163 (noting that factors the ALJ may consider when making a credibility determinations include the objective medical evidence, the claimant's treatment history, the claimant's daily activities, inconsistencies in testimony, effectiveness or adverse side effects of any pain medication, and relevant character evidence).  The ALJ must tie Mr. Warren's allegedly inconsistent actions to his allegations regarding disability.  *See Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991) ("So long as the adjudicator makes specific findings that are supported by the record, the adjudicator may discredit the claimant's allegations based on inconsistencies in the testimony or on relevant character

evidence"). It is not enough to simply say that Mr. Warren is not credible because his testimony about matters unrelated to his disability was inconsistent "without further corroboration or explanation" as to why these inconsistencies undermine the disability allegations. *See Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 884 (9th Cir. 2006); *see also Messee v. Colvin*, No. 2:16-CV-01259-DWC, 2017 WL 243355, at *3 (W.D. Wash. Jan. 20, 2017) (rejecting adverse credibility finding where the "ALJ merely noted Plaintiff reported inconsistencies regarding her substance use and a physician questioned Plaintiff's prescription drug use"). The ALJ thus failed to offer clear and convincing reasons supported by specific and legitimate evidence for rejecting Mr. Warren's pain testimony because of noncompliance with medical advice.

The ALJ's second basis for her adverse credibility finding—that Plaintiff's activities of daily living are inconsistent with his allegations of disability—is supported by substantial evidence. The ALJ pointed to a wide array of activities that Mr. Warren was engaged in including: preparing meals, going for walks, performing light gardening, performing light housekeeping, washing dishes, doing laundry, grocery shopping, taking care of personal hygiene without difficulty, driving, managing his finances, traveling to Denmark, and taking out the garbage. (AR 31.) Mr. Warren's activities demonstrate a greater ability than he alleged because he is able to perform daily tasks with little to no help. (AR 210-15.) *Thomas v. Barnhart*, 278 F.3d 947, 958–59 (9th Cir. 2002) (holding that a claimant's ability "to perform various household chores such as cooking, laundry, washing dishes, and shopping," suggested the ability to perform reduced light work). The ALJ identified the contradictions between Mr. Warren's reported activities and his asserted limitations as raising an issue of credibility. *See Morgan v. Comm'r Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir.1999) (holding the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting). For example, the ALJ concluded that Mr. Warren's ability to prepare meals, go on two 30-minute walks, garden, and work out served as evidence of Mr. Warren's ability to perform a range of light work. (AR 30-31.) The ALJ also found that Mr. Warren's credibility was undermined by his ability to travel annually to Denmark. (AR 31.) The ALJ could reasonably conclude that Mr. Warren was not as physically limited as he claimed

because he was able to sleep through most of an international flight, despite alleged neck pain. *See Tommasetti v. Astrue*, 533 F.3d 1035, 1039-40 (9th Cir. 1989) (holding that ALJ could properly infer that "based on his ability to travel to Venezuela for an extended time and care for his ailing sister … Tommasetti was not as physically limited as he purported to be"). Mr. Warren's active lifestyle contradicts his alleged disability, which is a clear and convincing reason for rejecting his testimony. (*Id.*)

Thus, while the ALJ erred in relying on Mr. Warren's noncompliance with medical advice as a basis for her adverse credibility finding, this error is harmless because the ALJ's conclusion that Mr. Warren's activities of daily living were inconsistent with his subjective reports of pain was a clear and convincing reason supported by substantial evidence. *See Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014) ("An error is harmless if it is inconsequential to the ultimate nondisability determination," or "if the agency's path may reasonably be discerned").

### CONCLUSION

For the reasons stated above, the Court DENIES Plaintiff's Motion for Summary Judgment (Dkt. No. 17) and GRANTS Defendant's Cross-Motion for Summary Judgment (Dkt. No. 21).

This Order disposes of Docket Nos. 17 and 21.

**IT IS SO ORDERED.**

Dated: July 26, 2018

_____
JACQUELINE SCOTT CORLEY
United States Magistrate Judge